# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

JOHN C. HANAUER,                    )
                                    )
      Plaintiff,                 )
                                    )
   vs.                            )         Case No. 2:09CV30JCH/MLM
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
      Defendant.                 )
                                    )

## REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael J. Astrue ("Defendant") denying the application for Social Security benefits under Title XVI

of the Act, 42 U.S.C. §§ 1381 et seq., filed by Plaintiff John Hanauer ("Plaintiff"). Plaintiff has filed

a brief in support of the complaint. Doc. 11. Defendant has filed a brief in support of the answer.

Doc. 16. This matter was referred to the undersigned United States Magistrate Judge pursuant to

28 U.S.C. § 636(b). Doc. 4.

## I.
## PROCEDURAL HISTORY

Plaintiff filed an application for disability benefits December 11, 2006.[1] Tr. 160. The claim

was denied initially on April 2, 2007. Tr. 77. Plaintiff requested a hearing, which was held on July

17, 2008, before Administrative Law Judge Francis J. Eyerman (the "ALJ"). Tr. 16-72.  On

December 18, 2008, the ALJ issued a decision finding that Plaintiff was not under a disability at any

_____

[1]     In his application Plaintiff alleged a disability onset date of February 27, 2006. At
the administrative hearing he amended his onset date to November 29, 2006. Tr. 19-21, 207.
Also, Plaintiff previously filed an application for benefits which was denied on April 10, 2006.

time through the date of the decision. Tr. 5-15. On May 6, 2009, the Appeals Council denied Plaintiff's request for review. Tr. 1-4. Thus, the ALJ's decision stands as the final decision of the Commissioner.

## II.
## MEDICAL RECORDS

On June 15, 2005, Plaintiff was evaluated by Philip Tweedy, M.D., for swelling in his wrists. Dr. Tweedy reported, on this date, that Plaintiff was trying to open a rear door on a trailer at work and had to swing a hammer with his right hand to force open the door; that almost immediately Plaintiff noticed swelling on the dorsal surface of the right hand, which extended into the wrists; that significant discomfort was present in Plaintiff's hand, wrists, and forearm; that Dr. Tweedy suggested an x-ray which was denied by Plaintiff; and that Plaintiff did not want the matter reported to his workplace. Tr. 308-309.

On August 23, 2005, Plaintiff presented to Timothy Jacobs, M.D., for an infection in his right ring finger. Dr. Jacobs's records of this date reflect that Plaintiff had been given Keflex in the emergency room for this infection. Dr. Jacobs further reported red streaking up the right arm; that Plaintiff was alert, oriented and "in no obvious distress"; and that Plaintiff was instructed to soak his wound and administer Silvadene and Cefzil with Vicoprofen for pain. Tr. 278-79.

Dr. Jacobs's records reflect that Plaintiff presented on August 25, 2005, for a re-check of his finger; that the redness in Plaintiff's arm was gone; that he still had some swelling in the finger; that Plaintiff's vital signs were stable; that Plaintiff declined an x-ray of the finger; and that Plaintiff could "go back to driving his truck [the] next week" absent continued problems with the finger. Tr. 280-81.

Records of David Arndt, M.D., reflect that Plaintiff presented on August 31, 2005. Dr. Arndt's notes of this date state that Plaintiff thought "he may have gout"; that Plaintiff was alert and in no acute distress; that his blood pressure was 148/60; that an x-ray showed no sign of bony

infection; that it was difficult to get a history from Plaintiff about his finger condition; and that culture results of the finger were pending. Tr. 283.

A September 2, 2005 radiology report from Gaspar Fernandez, M.D., states that views of the fourth digit on the right hand showed no evidence of displaced fractures, dislocations, focal osteolytic or osteoblastic lesions and that joint spaces appeared well preserved with no evidence of foreign body seen within the soft tissues. Tr. 284.

William Holt, M.D., reported on September 2, 2005, that Plaintiff presented pursuant to a referral for infection of the right fourth finger; that Plaintiff's work as a truck driver led to some continued local trauma to the finger; that Plaintiff was a diabetic and "smoke[d] a pack per day"; that Plaintiff had a history of a stomach ulcer and hepatitis C; that Plaintiff had a current Prilosec prescription; that Plaintiff had reduced "lymphangitic signs" in the finger; that Plaintiff's x-ray showed no sign of bone involvement; and that Dr. Holt arranged an appointment with the wound clinic at the hospital for treatment for a non-healing ulcer. Tr. 274.

On December 2, 2005, Timothy Jacobs, D.O., performed a "DOT physical" on Plaintiff. Dr. Jacobs's report states that Plaintiff "ha[d] what he call[ed] *diet-controlled diabetes*"; that Plaintiff had not ever been well-evaluated for diabetes; Plaintiff was "otherwise healthy"; and that Plaintiff was placed on a 3-month provisional plan to get his diabetes under control and was provided an appointment with Nurse Practitioner Connie Yoder for an evaluation. Tr. 273.

On December 12, 2005, Plaintiff cancelled his appointment with Nurse Practitioner Yoder following the referral by Dr. Jacobs. Tr. 275.

Records of December 20, 2005, state that Plaintiff "simply did not show up for his appointment" of that date with Nurse Practitioner Yoder. Tr. 275.

On January 3, 2006, Nurse Practitioner Yoder evaluated Plaintiff following the referral for his diabetes. Nurse Practitioner Yoder noted that Plaintiff "reported ... that he had been diabetic for some time but that he was *under good dietary control*"; that notes from previous providers "really indicate the contrary"; that Plaintiff's medications included Glucovance, Prilosec, Advil, and a Combivent inhaler to be used upon exposure to irritants; that Plaintiff "smoke[d] approximately 1/2-pack of cigarettes a day, by his report"; that Plaintiff's history was positive for COPD and positive for hepatitis C; that Plaintiff had a history of rheumatoid arthritis for which he was not currently being treated; that Plaintiff took Advil for flareups of his rheumatoid arthritis; that Plaintiff was an over-the-road truck driver; that Plaintiff did not exercise; that Plaintiff was aware of the benefits of a healthy diabetic-type meal plan and that Plaintiff "*[did] not indicate he [was] following one*"; that Plaintiff denied any new headaches, dizziness or seizures; that he denied any chest pain, heaviness or fullness; that Plaintiff had a long history of reflux disease, which was treated by Prilosec; that Plaintiff had problems with erectile dysfunction and no problems with urgency, frequency or burning; that Plaintiff had flare-ups of rheumatoid arthritis; that Plaintiff was alert, weighed 204 pounds, was 66 ½ inches tall, and had a blood pressure of 142/90; that Plaintiff's "abdomen [was] obese with positive normoactive bowel sounds"; that his *gait and posture were within normal limits*; that there were no deformities in regard to Plaintiff's joints; that Plaintiff was instructed to watch his glucose levels with his glucometer and to monitor his cholesterol; and that Plaintiff was provided samples of Diovan, Priolsec and Protonix and was provided renewal prescriptions. Tr. 273-77.

On April 6, 2006, Manoocher Nassery, M.D., evaluated plaintiff's respiratory condition. Dr. Nassery reported that *spirometry was normal,* with no evidence of obstructive or restrictive lung disease, and there was no significant change in flow rates following inhalation of bronchodilator. Tr. 300.

On June 8, 2006, Plaintiff was evaluated by Ted Oliver, M.S.W., L.C.S.W. Social Worker Oliver noted that Plaintiff was "*oriented* times three"; that "his *memory*, both recent and remote, was *intact*"; that Plaintiff has a history of alcohol, marijuana and methamphetamine abuse, with drug treatment several times, the last of which was after a DUI in 1998; that Plaintiff reported significant financial distress, was considering filing for bankruptcy protection, and was currently working with a lawyer to consider the possibility of a disability application; that Plaintiff "ha[d] no money for medications so apparently [was] not taking any at th[at] time"; that Plaintiff had good verbal skills; and that Plaintiff was "intelligent," had "some insight into his problems," and "appear[ed] motivated to receive services." Tr. 306-307.

On June 29, 2006, Plaintiff presented to Michelle Colen, M.D., at which time Plaintiff said he had "'body' pains recently," cough, especially in heat and with exertion, and *control of his blood glucose which he attributed to an increase in exercise*. Notes state that Plaintiff was "under care of Mark Twain Counseling Center" for depression; that his mood was "down" and attributed to losing his job, filing bankruptcy and losing his home. Notes further state that Plaintiff was provided samples of Advair for his asthma. Tr. 340-41.

On July 5, 2006, Dr. Colen completed a "certification of disability or handicap" form for Plaintiff for Hannibal Arms Apartments. The owner/manager of Hannibal Arms specified that the handicap inquiry was necessary for "determining applicant's eligibility for a project or units in a project where occupancy is limited to persons who are disabled or handicapped." Dr. Colen reported that Plaintiff "is disabled or handicapped as defined above" in reference to HUD Handbook 4350.3. Dr. Colen also checked "yes" in response to a question asking whether "the person has a disability as defined in section 223 of the Social Security Act" and checked "no" in response to whether "the

person has a developmental disability as defined by the Developmental Disabilities Assistance and Bill of Rights Act." Tr. 337-39.

On August 21, 2006, Dr. Colen started Plaintiff on Cymbalta and prescribed Colace due to rectal bleeding. Tr. 334.

On August 28, 2006, Plaintiff presented to Hannibal Regional Hospital emergency room with lacerations to the right third digit. The attending physician noted that Plaintiff "slipped and broke the glass he was carrying cutting his right third digit"; that wrist, neuro, vascular, tendons, and forearm were normal with sensation and motor intact; and that Plaintiff was in no acute distress. Tr. 346-48.

On September 13, 2006, Dr. Colen reported that Plaintiff was "no-show for 1 month re-check." Tr. 334.

On September 29, 2006, Plaintiff presented to the Hannibal Regional Hospital emergency room for injury to the lips. The attending physician reported that the eyelids were "conjunctivae" and that there was a lesion on the lower lip. Tr. 351.

On October 23, 2006, Plaintiff was evaluated by Bhagirath Katbamna, M.D. Dr. Katbamna reported on this date that Plaintiff had one episode of rectal bleeding and a history of hepatitis C; that he had *no nausea, vomiting*, fevers, chills, melena, hematochezia or hematemesis; that Plaintiff was a "very pleasant male" with clear lungs, no lymphadenopathy or thyromegaly; that, in regard to his heart, he had regular rate and rhythm and no murmurs; and that he had no masses or tenderness in the abdomen, and no clubbing or edema of the extremities. Tr. 310.

On October 25, 2006, Plaintiff presented to Dr. Colen for follow-up. Dr. Colen's notes of ths date state that Plaintiff reported "having problems with blood glucose"; that Plaintiff was having pain in the lower extremities; that Plaintiff described "pain 'all over' joints and muscles"; that Plaintiff

had decreased activity due to cooler weather; that Plaintiff was eating regularly; and that Plaintiff did not attribute highs in blood glucose to his diet. Tr. 333.

On November 2, 2006, Plaintiff presented to Dr. Colen for follow-up of "chronic conditions." Dr. Colen's notes of this date state that Plaintiff had "chronic back pain"; that he did not check his fasting; that Plaintiff's "mood comes and goes"; that his coughing increased on Spriva; that Plaintiff "didn't like HCTZ component due" to increased urination; and that Plaintiff was seeing a counselor and his suicidal thoughts were few. Tr. 331.

On November 13, 2006, Plaintiff presented to Dr. Colen for follow-up for "cellulitis." Dr. Colen reported on this date that Plaintiff had decreased redness, swelling, pain, drainage and "central opening," and that Dr. Colen prescribed continuation of Cipro and a warm, moist cloth to be applied to area three to four times per day. Tr. 328.

On November 16, 2006, Raman Danrad, M.D., evaluated Plaintiff for right sided abdominal pain. Dr. Danrad reported that both lung bases were clear; that there was no pleural effusion at the lung bases; that there was no evidences of ascites, bowel obstruction or pneumoperitoneum; that the visualized osseous structures were unremarkable; that the liver, spleen, pancreas, both kidneys and adrenal had normal contrast enhancement; that the retroperitoneal great vessels showed normal enhancement; that there was no retroperitoneal lymphadenopathy; that was no ascitis or bowel obstruction; that there was a defect in the subcutaneous tissue in the right flank just above the level of the iliac crest with the stranding and granulation tissue in the surrounding subcutaneous fat "without evidence of any abscess"; that Plaintiff had a history of abdominal pain and pelvic pain; that the urinary bladder showed normal outline; that there was no free fluid in the pelvis; that there was no pelvic or inguinal lymphadenopathy; that there was a moderate amount of fecal matter in the colon

and rectum; that a few scattered diverticuli were noted; and the prostate was not bulky with seminal vesicles unremarkable. Tr. 321-23.

On December 2, 2006, Plaintiff was evaluated by Normal Clarkson, M.D., at the Northeast Regional Medical Center when Plaintiff presented in the emergency room. Dr. Clarkson noted that Plaintiff had a swollen lower lip, fever, and chills; that Plaintiff's medications included Cipro, Cymbalta, Lipitor and Metformin; that Plaintiff did not have chest pain; that he had harsh, rasping breathing sounds; that he was anxious; that he had a history of *non-insulin-dependent diabetes mellitus*; that Plaintiff's neurological systems were "unremarkable"; that Plaintiff had frequent infections; that Plaintiff was diagnosed with herpes simplex of the lip and mucocutaneous junction, local chin folliculitis, local cellulitis and a history of hepatitis C; that Dr. Clarkson prescribed Acyclovir, Acyclovir ointment five times per day, Augmentin, Ibuprofen, Percocet, liberal fluids, an ice pack, and a hot pack to the follicular lesion; and that Plaintiff was to follow up with his physician of choice within 24 hours to five days. Tr. 312-15.

On December 3, 2006, Pranav Parikh, M.D., of the Hannibal Regional Hospital, reported that Plaintiff was diagnosed with methicillin-resistant staphylococcus aureus bacteremia, methicillin-resistant staphylococcus aureus pneumonia, herpes simplex infection of the lips, cellulitis of the lip and right side of the neck, chest pain secondary to pneumonia, diabetes, which was "out of control," and cirrhosis; that Plaintiff was admitted to the hospital with severe findings of respiratory difficulty with respiratory failure; that after he was given a steroid injection Plaintiff "started to become much, much improved"; that "[w]ith methicillin-resistant Staphylococcus aureus growing out of his blood, he was switched over to vancomycin and then Zyvox and has [done] very well with this"; that Plaintiff's diabetes was treated with insulin and would "be switched over to metformin"; that Celexa and inhalers were continued; that "the blistering on his lips ha[d] decreased"; that his lungs showed

"good air movement"; that his heart had regular rate and rhythm; that his extremities showed no edema; that his neurological mood and judgement were within normal limits; that Plaintiff's echocardiogram "showed normal left ventricular cavity dimension with hyperdynamic left ventricular wall motion"; and that a CT scan of the pelvis showed "nodular liver consistent with cirrhosis." Tr. 353-54.

On December 4, 2006, Brian Schneider, M.D., performed a "central line placement" on Plaintiff. "[A] central venous catheter [was] introduced in the left with its tip projecting at or near the superior caval atrial junction." The doctor reported that Plaintiff's heart and lungs were normal. Tr. 364, 368.

On December 4, 2006, Raman Danrad, M.D., reported that a CT scan of neck soft tissue, with and without contrast, showed swelling in the subcutaneous tissue overlying the mandible on the right side and the right upper lip extending into the midportion of the neck; that the underlying right maxilla and the right side of the mandible did not show destructive or lytic lesions; that the carotid space and its contents were unremarkable; that lung apices demonstrated a subcentimeter cavitating lesion in the right apex with few scattered tiny focal infiltrates noticeable; that the findings were indicative of cellulitis involving the subcutaneous tissue of the right side of the face, particularly the upper lip and the region of the chin with no underlying abscess or bony destruction. Tr. 375.

On December 4, 2006, Plaintiff presented to Dr. Danrad for complaints of chest pain and possible pneumonia. Dr. Danrad reported on this date that Plaintiff's heart size was normal; that there was no pericardian effusion; that there were no "bulky mediastinal lymph nodes although the evaluated [was] limited due to lack of intravenous contrast"; that "there [were] multiple focal areas of ground-glass densities most of which are less than 1 cm in diameter"; that the largest lesion measured 2.2 cm in diameter and showed a central cavitation; that there was focal infiltrate in the

anterior segment of the left lower lobe presumed to be early pneumonia; and that the liver showed nodular contour raising concern for cirrhosis with mild prominence of the left adrenal grand. Tr. 377.

On December 5, 2006, Plaintiff presented to Richard Ha, M.D., for possible endocarditis. Dr. Ha reported that Plaintiff had normal left ventricular chamber dimension with a hyperdynamic left ventricular wall motion; that Plaintiff had trace pericardial effusion with no significant hemodynamic consequence; that there was "no transthoracic echocardiographic evidence of endocarditis involving the valve, although, pulmonic valve was not visualized very well"; and that there were "no intracardiac masses or thromboses." Tr. 380-81.

On December 5, 2006, Alan Nichols, M.D., performed a CT angiography of Plaintiff's chest. Dr. Nichols reported that the angiography showed no evidence for pulmonary embolus, unchanged multiple focal areas of infiltrate and nodular-like abnormalities, a small right pleural effusion, nodular contour of liver again compatible with cirrhosis, a 10 mm low density focus in posterior right hepatic lobe present previously but seen better with intravenous contrast, and a 7 mm low density focus in a slightly "superior location but also in the posterior half of the right hepatic lobe." Tr. 373.

On December 6, 2006, Raul Martin, M.D., reported that a chest x-ray of that date was compared with the chest x-ray from two days prior; that, in comparison, "the left costrophrenic angle [was] better defined with decrease amount of opacification"; and that there was "improving atelectasis or infiltrates in the left lower lobe with a small effusion." Tr. 370.

John Gamble, M.D., reported on December 6, 2006, that Plaintiff had a fever and possible abscess and that Dr. Gamble found the nodular liver consistent with cirrhosis and found minimal perihepatic and left pericolic gutter ascites. Tr. 379.

On December 9, 2006, upon Plaintiff's discharge from the hospital, Dr. Bartlett reported that he "counseled [Plaintiff] about the importance of" checking his blood sugars and his respiratory status; that multiple CT scans had not shown cavity lesions in Plaintiff's lung; that upon discharge Plaintiff's *lungs had good air movement, were clear to auscultation bilaterally*, and had no wheezes, rales or rhonchi; that upon discharge Plaintiff had *no edema in his extremities*, his neck was soft and supple, and his *mood, affect, insight and judgment were within normal limits*; and that Plaintiff's blood sugars were elevated upon admission and on discharge his blood sugar was 176 with a BUN of 30, creatinine of 1.0, potassium of 4.5, and hemoglobin A1C was 8.3. Tr. 356.

Dr. Colen reported on December 18, 2006, that Plaintiff presented for a follow-up for MRSA, pneumonia, and bacteremia; that Plaintiff had increased chest pain on the right side; that he had reduced energy, reduced appetite and a more depressed mood; that Plaintiff had "stopped seeing counselor"; that Plaintiff's blood sugar was below 200 with the usual reading between 250 and 260; and Plaintiff reported no activity due to illness. Tr. 383.

Dr. Colen reported on January 8, 2007, that Plaintiff presented for a follow-up regarding pneumonia, abscess and bacteremia; that Plaintiff said he had low appetite which had improved in prior two days; and that Plaintiff's "HTN" was "stable." Tr. 385.

On January 11, 2007, Plaintiff met with Social Worker Oliver. Social Worker Oliver reported on this date that Plaintiff's hygeine was good; that his *affect and mood were well within normal limits*; that Plaintiff left his job as a trash hauler to work as a taxi cab driver; and that Plaintiff "seem[ed] to *benefit from having someone to talk to as he deals with his health problems.*" Tr. 386.

On March 7, 2007, Plaintiff underwent pulmonary function testing. The testing report states that no significant change was observed relative to the previous study completed April 6, 2006, and *spriometry* was *"normal."* Tr. 390-92.

On March 13, 2007, Plaintiff presented to Dr. Bartlett regarding his use of tobacco. Dr. Bartlett reported that a computed axial tomography ("CAT") scan showed a right lower lobe cavitary mass in Plaintiff's lungs; that Plaintiff said he was *doing "fairly well"*; that Plaintiff said he had *no* fever, chills, *nausea or vomiting*; that "the vast review of [Plaintiff's] systems again [were] negative"; that Plaintiff was in no acute distress; and that Plaintiff was counseled on smoking cessation. Tr. 396-97. The impression from a CT of the chest on that same date was consistent with chronic infectious process and showed a mass in his lungs. Tr. 394.

Dr. Colen reported on May 25, 2007, that Plaintiff presented for follow-up regarding depression, COPD, arthritis, acid reflux, MRSA, diabetes and back pain; that Plaintiff's mood was "okay"; that Plaintiff was "watching [his] diet"; and that he was "trying to decide what to do career vs disability." Tr. 464.

Social Worker Oliver reported on June 14, 2007, that Plaintiff had been seen intermittently for the past several months at Mark Twain; that Plaintiff's hygiene was good; that his *mood* was "*within normal limits*"; and that Plaintiff said he was seeing a woman socially. Tr. 439.

Social Worker Oliver reported on June 25, 2007, that Plaintiff was seen on this date for individual therapy; that his hygiene was good; that his *affect and mood* were "*within normal limits*"; that he "appeared to be in a brighter mood since last session"; and that Plaintiff said he was enjoying time spent with a woman. Tr. 439.

Louis W. Brittingham, D.O., reported on July 13, 2007, that a spinal x-ray showed that Plaintiff had *mild degeneration* in the lower lumbar spine. Tr. 477-478.

An August 8, 2007 magnetic resonance imaging scan ("MRI") report completed by William Reed, M.D., stated "no level demonstrate[d] evidence of spinal canal stenosis or acute disk herniation." Tr. 480.

On August 24, 2007, Plaintiff presented to Dr. Colen following a hospitalization the first week of August 2007 for pneumonia. Dr. Colen reported that Plaintiff was prescribed Coumadin for a "blood clot in the heart" and Lantus. Tr. 460.

On September 19, 2007, Dr. Colen reported that Plaintiff's nausea had decreased; that Plaintiff said his back pain was constant and was getting worse; and that Dr. Colen referred Plaintiff to a pain management clinic. Tr. 456.

On November 15, 2007, Plaintiff presented to Dr. Colen for continued back pain and "some nausea at night, 4xc/wk." Dr. Colen reported on this date that Plaintiff had two boils on his neck. Tr. 455. On November 16, Dr. Colen reported that Plaintiff's laboratory results were "good." Tr. 454.

Social Worker Oliver reported on December 18, 2007, that Plaintiff reported enjoying a trip, and that Social Worker Oliver "prob[ed] for any difficulties" and "none were reported." Tr. 443.

Social Worker Oliver reported on January 8, 2008, that Plaintiff's affect was bland and his mood was dysthmic; that his thoughts were clear and goal oriented; and that Plaintiff complained of insomnia and pain in his back. Tr. 443.

Dr. Colen reported on January 24, 2008, that Plaintiff said he had increased lower back pain; that Plaintiff was concerned about additional MRSA infections; and that Plaintiff "saw pain clinic but 'freaked him out' due to friend [having an] adverse reaction, so didn't have injection." Tr. 452.

On February 2, 2008, Social Worker Oliver reported that Plaintiff's affect was bland and his mood was dysthmic; that Plaintiff continued to discuss symptoms of physical pain; and that Plaintiff had an appointment at a pain clinic. Tr. 443.

Medical records of March 25, 2008, state that doctors attempted decolonization as a treatment for Plaintiff's recurrent MRSA infections, and that the abscesses mostly "drain[ed] on their own and [went] away." Tr. 424-27.

An April 2, 2008, a transesophageal echocardiogram performed by Gong-Yuan Xie, M.D., showed a small calcified mass in Plaintiff's right atrium, the etiology of which was most likely a thrombus. Tr. 428-430, 434-436. An abdominal ultrasound performed by Dr. Xie on this same day showed mild hepatomegaly and a right inferior renal cyst. Tr. 431-32.

Dr. Colen reported on April 17, 2008, that Plaintiff said his home *glucose checks were "good"* and had *improved due to increased activity*; that Plaintiff reported chronic back and hip pain and that his pain increased in rainy weather; and that Dr. Colen again referred Plaintiff to a pain clinic. Tr. 446-48.

June 16, 2008, records from a pain clinic reflect that Plaintiff received injections on May 1 and May 16, 2008, and radio-frequency ablation treatment; that Plaintiff said that this helped his hip pain and "did nothing for his back"; and that Plaintiff said he had a history of alcohol abuse and recreational drug use. Tr. 482-85. It was reported on June 25, 2008, that recent views of Plaintiff's thoracic spine showed and no "significant spinal stenosis or bulging disk that would be symptomatic." Tr. 486-91.

On July 23, 2008, Plaintiff underwent a consultative examination by Frank Froman, Ed.D., a clinical psychologist. Dr. Froman reported that Plaintiff said that he had lost interest in life, was depressed and felt blue and unhappy; that he diagnosed Plaintiff with mild to moderate major depressive disorder; and that Dr. Froman assigned Plaintiff a Global Assessment of Functioning (GAF) scale score of 62.[2] Dr. Froman concluded that Plaintiff "appear[ed] able to perform one and two-step

---

[2]     Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 32.

assemblies at or near a competitive rate"; that Plaintiff was "still able to relate adequately to coworkers and supervisors"; and that "it will be difficult for him to withstand the stress associated with customary employment at this time, primarily because of the physical symptoms he reports." Dr. Froman reported on a Social Security Medical Source Statement that Plaintiff would have *moderate limits in carrying out complex instructions and making judgments in complex work-related decisions*. Tr. 493-500.

On June 4, 2008, Plaintiff presented to Dr. Colen for a sore on his chin and chronic back pain. Dr. Colen reported on this date that Plaintiff said that *injections he had received for back pain "helped but only 2-3rd"*; that Plaintiff was scheduled to return to the pain clinic; and that Plaintiff's Vicodin was renewed. Tr. 144.

On June 19, 2008, Dr. Colen reported that Plaintiff was seen for follow-up "along [with] blood work"; that Plaintiff reported his lesions were healed "for now" and that his home sugars were "not too bad"; that Plaintiff said his nausea was worse with the heat and that he stayed inside when it was over ninety-five degrees; and that his lungs were clear. Tr. 142.

July 16, 2008 records from Dr. Colen's office reflect that Plaintiff required a refill of pain pills because his back was "hurting a lot"; that he required "something for nausea"; that Plaintiff said he "gets very ill when very hot outside"; and that Plaintiff's reflux was "doing well." Tr. 140.

August 15, 2008 records from Dr. Colen's office reflect that Plaintiff needed refills of Vicodin; that Plaintiff was doing well on Cymbalta; and that Plaintiff "started pain clinic." Tr. 139.

Records reflect that Plaintiff had three epidural steroid injections from October 2008 to January 2009 for his back pain and that Plaintiff was "discharged in satisfactory condition to follow up" with his next appointment. Tr. 119-22, 124-28.

Plaintiff testified that, at the time of the hearing, he was fifty-three years old; that he was divorced and living by himself in a ground-level apartment; that he completed school through the eleventh grade; that he was working whenever his health would permit or approximately ten hours per month as a taxi-cab driver, earning one hundred and twenty-five dollars each month; and that he did not help passengers load luggage and groceries or help them into their homes in his work capacity; that he did not work some weeks at all. Tr. 25-27, 59.

Plaintiff further testified that his Hepatitis C caused him to become very fatigued; that he became tired easily while walking; that he had Hepatitis since 1991 and had been through three courses of treatment, which were successful; that he becomes dizzy when he gets up quickly, gets excited, or over-exerts himself; that *had nausea three to four times a week and vomited four to five times within the period of nausea*; that he had diabetes and had been insulin-dependent for two to three years; that his blood sugar level spiked as high as "220, 225" and dropped "down to 40." Tr. 26-29

Plaintiff testified that he had trouble with wounds healing on his body; that in December 2006, he contracted MRSA, causing him to have sores on his "neck, on my side, perhaps leg, face"; that his last hospitalization due to MRSA was a year prior to the hearing; and that the symptoms of his MRSA flare-ups include fever, tiredness, sickness "like you've got a real bad flu," and numbness and burning in the hands. Tr. 29-32.

Plaintiff also testified that, at the time of the hearing, he was taking Singulair, Albuterol and Advair; that he used a Nebulizer for breathing problems; that he took three Vicodin each day for pain; that he had four to five Toradol shots from January 2008 to July 2008; that walking on level ground gave him shortness of breath; that he had difficulty breathing on hot and humid days; that he had lower back pain and pain in the base of his neck; that the back pain went down into his legs and knees;

that he was discussing back surgery options with his doctors; that he had fibromyalgia pain in his shoulder blades; that he had restless leg syndrome; that his legs jerked and keep him awake when he would lay down; and that he spent much of his days lying down and four out of seven days he did not get out of bed. Tr. 33-38.

Plaintiff testified that he began psychological counseling in 1991; that he was receiving counseling at Mark Twain Area Counseling from Social Worker Oliver at the time of the hearing; that Dr. Colen prescribed Cymbalta for his depression; that his depression symptoms included crying spells, suicidal thoughts, and excessive worrying; that his crying spells occurred from once each week to once each night; and that he "sometimes" had difficulty getting along with other people, depending on mood. Tr. 38-41.

Plaintiff further testified that his children and landlord shopped for him; that he drove to the hearing; that he did not have any problems getting dressed and that "it just [took] a while sometimes"; that he changed the sheets on his bed; that he washed his clothes "probably every other week"; that he did not cook; that his daughters brought him food and cleaned his apartment; that he did not have any problems getting in and out of the bathtub and was able to sleep through the night; that he went to bed at "probably four or five o'clock in the morning" because he could not sleep; that he woke up at eleven or eleven thirty in the morning; that he watched television; that he was able to comfortably sit for fifteen to twenty minutes, stand for ten minutes, and lift a gallon of milk with two hands; that he became dizzy or had pain in his back when he bent over; that he could not squat or stoop without pain and dizziness. Tr. 43-45, 47, 55.

## IV.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to

meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. § § 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. § § 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. § §416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's Residual Functional Capacity ("RFC"). Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater,

87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. Cox, 495 F.3d at 617; Guillams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

> (1) The findings of credibility made by the ALJ;
>
> (2) The education, background, work history, and age of the claimant;
>
> (3) The medical evidence given by the claimant's treating physicians;
>
> (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations

by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Guillams, 393 F.3d at 801; Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy

that can realistically be performed by someone with the plaintiff's qualifications and capabilities. <u>Goff</u>, 421 F.3d at 790; <u>Nevland</u>, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. <u>Goff</u>, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); <u>Rautio</u>, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. <u>Baker v. Barnhart</u>, 457 F.3d 882, 894-95 (8th Cir. 2006); <u>Carlock v. Sullivan</u>, 902 F.2d 1341, 1343 (8th Cir. 1990); <u>Hutsell</u>, 892 F.2d at 750.

# V.
# DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. <u>Onstead</u>, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm his decision as long as there is substantial evidence in favor of the Commissioner's position. <u>Cox</u>, 495 F.3d at 617; <u>Krogmeier</u>, 294 F.3d at 1022.

The ALJ in the matter under consideration found that Plaintiff has severe impairments of degenerative disc disease, COPD, MRSA infection, and diabetes and non-severe depression. The ALJ further found, however, that Plaintiff is not disabled and that he can perform the full range of work at all exertional levels with the exception that he must avoid exposure to concentrated exposure to temperature extremes, humidity, wetness, and pulmonary irritants. Upon reaching this conclusion, the ALJ discounted Plaintiff's claims of pain, vomiting, and nausea. Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ did not properly assess Plaintiff's

credibility; because the ALJ erred in his assessment of Plaintiff's obesity; because the ALJ failed to properly consider the testimony of Plaintiff's landlord and his daughter; and because the ALJ erred in discounting the opinion of the Vocational Expert ("VE") that there is no work which Plaintiff can perform.

## A. Plaintiff's Credibility:

As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole and a court cannot substitute its judgment for that of the ALJ. Guillams V. Barnhart, 393 F.3d 798, 801(8th Cir. 2005); Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882. To the extent that the ALJ did not specifically cite Polaski, case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, as also more fully set forth above, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004); Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Montgomery v. Chater, 69 F.3d273, 275 (8th Cir. 1995). Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F. 3d 963, 966 (8th Cir. 1996). In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d

710, 714 (8th Cir. 2003).  See also Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).  For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, the ALJ considered that the objective medical evidence did not support Plaintiff's subjective complaints.  The ALJ reached this conclusion only after reviewing the medical evidence of record.  In particular, the ALJ considered that in January 2006, Plaintiff's diabetes was uncontrolled; that April 2006 pulmonary function testing showed no abnormalities; that Plaintiff's diagnosis in 2006 included COPD, rheumatoid arthritis, and hepatitis C; that June 2006 records from Mark Twain Area Counseling Center stated that Plaintiff quit truck driving due to a severe asthma attack, that Plaintiff had a GAF of 55, which reflected moderate symptoms, that Plaintiff was counseled mainly for his ability to cope with his physical complaints and his relationship with his girlfriend, that Plaintiff's mood and affect were normal throughout 2007, and that when Plaintiff had a bland affect and dysthmic mood it was due to his physical condition; that Plaintiff was seen for depression, neck and shoulder pain, and an abdominal skin lesion from August through November 2006; that Dr. Colen authorized a certificate of disability or handicap for Plaintiff in July 2006; that Plaintiff's diabetes was poorly controlled in February 2007 and he had difficulty breathing; that a March 2007 pulmonary function test was normal; that an August 8, 2007 MRI showed no spinal canal stenosis or acute disc herniations; that Plaintiff complained of shortness of breath in November 2007; that in January 2008 Plaintiff complained of back pain and had lesions; that in March 2008 Plaintiff said the weather affected his breathing and scarred lesions were noted on his right neck; that Plaintiff complained of hip and back pain in April 2008; that in April 2008 Plaintiff said an epidural injection helped somewhat; that Plaintiff was hospitalized in December 2006 for respiratory failure and diagnosed with MRSA, bacteremia and pneumonia, herpes simplex infection of the clips, and cellulitis

of the lips and right side of the neck; that during this hospitalization his uncontrolled diabetes was aggressively managed; that in March 2008 Plaintiff had no abscesses or skin lesions, was begun on decolonization, and given medication; that a echocardiogram of April 2008 showed a calcified mass in the right atrium wall which was attributed to a likely thrombosis; and that an ultrasound of that same date showed mild hepatomegaly and a right inferior renal cyst. Tr. 11-12. The ALJ also considered Dr. Froman's July 23, 2008 report, in detail. Tr. 12. The court also notes that physical examinations often showed that Plaintiff had normal or adequate gait and normal or mildly decreased strength and tone. Tr. 134-35, 137-38, 140, 292, 313-14, 484, 487. Additionally, April 2006 spirometry was normal; a July 2007 x-ray showed only mild degeneration in the lower lumbar spine, November 2007 laboratory results were good, in April 2008 Plaintiff's glucose was good, a May 2008 MRI showed no significant spinal stenosis or bulging disk which would be symptomatic, and in January 2008 Plaintiff was in satisfactory condition after steroid injections. Tr. 390-92, 454, 477-78, 486. Although Plaintiff testified at the hearing that he has frequent nausea and vomiting, he reported in October 2006 and March 2007 that he had no nausea or vomiting. To the extent Plaintiff told Dr. Colen in July 2008 that his nausea was worse, he said he was exacerbated by exposure to heat, which the ALJ acknowledged that Plaintiff must avoid. Additionally, Plaintiff's diabetes was reported controlled with diet in December 2005 and in January and June 2006; upon discharge from the hospital, in December 2006, Plaintiff's blood sugar level was 176; in April 2008 his home glucose checks were good; and in June 2008 his glucose levels were "not too bad." Also, on several occasions, Plaintiff attributed control of his diabetes to exercise. While an ALJ may not reject a claimant's subjective complaints based solely on the lack of medical evidence to fully corroborate the complaint, Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996), the absence of an objective medical basis to support the degree of Plaintiff's subjective complaints is an important factor in evaluating the

credibility of the testimony and the complaints. See Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991); Edwards v. Secretary of Health & Human Services, 809 F.2d 506, 508 (8th Cir. 1987). The court finds, therefore, that the ALJ properly considered that the objective medical evidence did not support Plaintiff's claim of disability and that the ALJ's decision in this regard is supported by substantial evidence.

Second, as stated above, the ALJ considered that spinal injections improved Plaintiff's pain; that Plaintiff uses an inhaler when he experiences shortness of breath; that provided he stays away from pulmonary irritants, temperature, and humidity, Plaintiff's breathing difficulties are kept under control; and that each time Plaintiff had lesions, they were treated with antibiotics without ongoing problems. Conditions which can be controlled by treatment are not disabling. See Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling);Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James, 870 F.2d at 450. The court finds, therefore, that the ALJ properly considered the success of Plaintiff's treatment, and further finds that substantial evidence supports the ALJ's decision in this regard.

Third, the ALJ considered that no doctor who has treated or examined Plaintiff has ever stated that he is disabled or unable to work and that no doctor has placed any restrictions on Plaintiff's functional capabilities. The absence of physician imposed restrictions and work limitations is significant. Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000). A record that does not contain any physician opinion of disability or total inability to work detracts from the claimant's subjective complaints. Reney v. Barnhart, 396 F.3d 1007, 1011 (8th Cir. 2005); Anderson v. Shalala, 51 F.3d 777, 780 (8th Cir. 1995); Edwards v. Sec'y of Health & Human Servs., 809 F.2d 506, 508 (8th Cir.

1987); Fitzsimmons v. Mathews, 647 F.2d 862, 863 (8th Cir. 1981); and Kovach v. Apfel, 119 F. Supp. 2d 943, 967 (E.D. Mo. 2000).

Indeed, Dr. Colen, Plaintiff's treating doctor, completed a Form titled Certification of Disability or Handicap for the Rural Housing Service. Dr. Colen stated on this Form that Plaintiff does not have the ability to engage in substantial gainful activity because of a physical or mental impairment that is expected to last for at least twelve months and that Plaintiff has a disability as defined by the Social Security Act. Tr. 338-39. The opinions and findings of the plaintiff's treating physician are entitled to "controlling weight" if that opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2) (2000)). If they are not controverted by substantial medical or other evidence, they are binding. Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir.1991); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)). However, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data. Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate need to evaluate record as whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir.1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to opinion when a medical source presents relevant evidence, such as medical signs, in

28

support of his or her opinion). See also Hacker v. Barnhart, 459 F.3d 934, 9937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is giving controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence"). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). Most significantly, a treating physician's checkmarks on a form are conclusory opinions which can be discounted if contradicted by other objective medical evidence. Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004); Hogan 239 F.3d at 961; Social Security Ruling 96-2p, (July 2, 1996). Moreover, a treating physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Indeed, a brief, conclusory letter from a treating physician stating that the applicant is disabled is not binding on the Secretary. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir.1986) (per curiam) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature."). See also Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight should not be given to the RFC assessment); Chamberlain, 47 F.3d at 1494; Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir.1994) (citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir.1991)); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of

total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, diagnostic evidence).   The ALJ in the matter under consideration considered the record as a whole, including the records of Dr. Colen. Moreover, Dr. Colen's statement on the Form that Plaintiff is disabled is not controlling. See  Stormo, 377 F.3d at 805-06; Hogan 239 F.3d at 961; Ward, 786 F.2d at 846. To the extent the ALJ may have erred upon stating that no doctor opined that Plaintiff is disabled, such an error does not warrant reversal and/or remand, when the decision of the ALJ is based on substantial evidence on the record as a whole. See also Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006) ("The fact that the ALJ did not elaborate on this conclusion does not require reversal, because the record supports her overall conclusion.").  Moreover, Dr. Colen's treatment records are not consistent with the statement she made on the Form. See Leckenby, 487 F.3d at 632.

Fourth, the ALJ considered that Plaintiff did not have physical therapy or surgery to treat his pain.  Failure to seek aggressive treatment and limited use of prescription medications is not suggestive of disabling pain  Rautio v. Bowen, 862 F. 2d 176, 179 (8th Cir. 1988).  Moreover, seeking limited medical treatment is inconsistent with claims of disabling pain. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003) ("[T]he ALJ concluded, and we agree, that if her pain was as severe as she alleges, [Plaintiff] would have sought regular medical treatment.").  The court finds that the ALJ's decision in this regard is supported by substantial evidence and that it is consistent with the Regulations and case law.

Fifth, the ALJ considered that any limitations which Plaintiff alleges he has have been self-imposed in that they were not prescribed by a treating physician. A claimant's limitation which is self-imposed rather than a medical necessity is a basis upon which an ALJ may discredit a claimant's alleged limitation. See Blakeman v. Astrue, 509 F.3d 878, 882 (8th Cir. 2007) ("The issue is not

whether [the claimant] was credible in testifying that he naps each weekday afternoon he is not working. The issue is whether his heart condition compels him to nap each afternoon."); Brunston v. Shalala, 945 F. Supp. 198, 202 (W.D. Mo. 1996 ("Plaintiff also testified that she spent part of the day lying down; however, no physician stated that such a need existed. If plaintiff was not lying down out of medical necessity, then that indicates that she was lying down by choice."). Further, where there is a lack of documentation regarding a claimant's allegation that he needs to take daily naps, an ALJ may conclude that the claimant chose to nap. See Schroeder v. Sullivan, 796 F. Supp. 1265, 1270 (W.D. Mo. 1992) (holding that the claimant's need to take naps was not documented in the record and because the claimant failed to complain to his doctors about drowsiness, "contradict[ed] his assertion that he must nap during the day"; "It is as likely that Plaintiff chooses to nap at times he might otherwise choose to remain awake."). The court finds that the ALJ's decision regarding Plaintiff's self-imposed limitations is supported by substantial evidence and that it is consistent with the Regulations and case law.

Sixth, the ALJ considered that although Plaintiff has been diagnosed with COPD, he "still smokes a half pack of cigarettes a day." [3] Tr. 63. Indeed, the record reflects that Plaintiff has been advised to cease smoking by his doctors. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (holding that a claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain. The court finds that the ALJ's decision regarding Plaintiff's continued smoking is supported by substantial evidence and that it is consistent with the Regulations and case law.

---

[3]    The court notes that Plaintiff testified at the hearing that he smokes a pack of cigarettes a day. Tr. 49.

In summation, the court finds that the ALJ's consideration of Plaintiff's credibility is based on substantial evidence and that it is consistent with the case law and Regulations.

**B.     Plaintiff's Obesity:**

Plaintiff's medical records reflect that in March 2007 he weighed 196 pounds and in July 2008 he weighed 221 pounds. Plaintiff testified at the hearing in July 2008 that he was five feet six inches tall; that he weighed 225-226 pounds; and that he weighed that amount for "several years." Plaintiff did not allege obesity as an impairment prior to his filing his Brief in Support of Complaint. Plaintiff contends that the ALJ erred by failing to properly consider his obesity.

First, "[t]he fact that [claimant] did not allege [a particular impairment] in [his] application for disability benefits is significant, even if the evidence of [the impairment] was later developed." Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).

20 C.F.R.,Pt. 404, Subpt. P, App. 1, 1.00, Q, states:

Effects of obesity. Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

Social Security Ruling ("SSR") 02-01p, 2000 WL 628049, at *2-5 (Sept. 12, 2002), states, in relevant part, that:

Obesity is a complex, chronic disease characterized by excessive accumulation of body fat. Obesity is generally a combination of factors (e.g., genetic, environmental, and behavioral). . . .

We will consider obesity in determining whether:

The individual has a medically determinable impairment. . . .

The individual's impairment(s) is severe. . . .
The individual's impairment(s) meets or equals the requirements of a listed impairment in the listings. . . .
The individual's impairment(s) prevents him or her from doing past relevant work. . . .

If an individual has the medically determinable impairment obesity that is "severe" as described [above], we may find that the obesity medically equals a listing. . . . We may find in a title II claim, or an adult claim under title XVI, that the obesity results in a finding that the individual is disabled based on his or residual functional capacity (RFC), age, education, and past work experience. However, we will also consider the possibility of coexisting or related conditions, especially as the level of obesity increases. . . .

There is no specific weight or BAI that equates with a "severe" or a "not severe" impairment. . . . Rather, we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe. . . .

Because there is no listing for obesity, we will find that an individual with obesity may meet the requirements of a listing if he or she has another impairment that, by itself, "meets" the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing.

Although the ALJ in the matter under consideration did not consider Plaintiff's alleged obesity, the record does not reflect that Plaintiff sought treatment for this condition. As such, there were no records regarding Plaintiff's obesity for the ALJ to consider. In any case, Plaintiff's failure to seek treatment for his alleged disability based on obesity is a basis upon which to discredit his claim that he is disabled as a result of obesity. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) ("[Claimant's] failure to seek medical assistance for her alleged physical and mental impairments contradicts her subjective complaints of disabling conditions and supports the ALJ's decision to deny benefits."); Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989); Rautio, 862 F.2d at 179.

To the extent that Plaintiff contends his body mass index of 36.3 and his weight classify him as overweight and obese, as stated above, a claimant may not be found disabled merely based on his weight unless the obesity is severe. <u>See</u> SSR 02-01p. Moreover, when considering Plaintiff's alleged limitations, the ALJ in the matter under consideration considered the record as a whole upon determining Plaintiff's RFC. Significantly, Plaintiff does not suggest how his obesity limits his ability to engage in work related activity. Moreover, no doctor imposed restrictions based on Plaintiff's weight. <u>See</u> <u>Russell</u>, 950 F.2d at 545; <u>Edwards</u>, 809 F.2d at 508. The court finds, therefore, that the ALJ's decision is supported by substantial evidence in regard to Plaintiff's obesity and that it is consistent with SSR 02-01p.

**C.      Plaintiff's Depression:**

20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 § 12.00(a) states, in relevant part, that:

> The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

The ALJ found that Plaintiff's depression was not severe. To the extent that Plaintiff contends that the ALJ erred in regard to his consideration of the medical records regarding his alleged the depression, the court first notes that the ALJ considered medical records relevant to Plaintiff's treatment for depression, including the records of Social Worker Oliver and the report from Dr. Froman which stated that Plaintiff was generally functioning pretty well and had some meaningful personal relationships and that Plaintiff has moderate limitations in carrying out complex instructions, making judgments on complex work-related decisions, and in responding appropriately to usual work situations or changes in routine work settings. Additionally, Social Worker Oliver noted in June 2006 that Plaintiff was oriented; that his memory was intact; and that he had good verbal skills and was

intelligent. In January 2007 Social Worker Oliver reported that Plaintiff's mood and affect were within normal limits and in June 2004 he twice reported that Plaintiff's mood was within normal limits. Also, Dr. Bartlett reported in December 2006 that Plaintiff's mood, affect, insight, and judgment were within normal limits. As such, the court finds that Plaintiff's medical records are not consistent with his claim that he is disabled based on depression and that the ALJ's consideration of Plaintiff's medical records upon finding his depression not-severe is supported by substantial evidence.

Further, when Plaintiff was seen by Social Worker Oliver, Plaintiff's personal life was a topic for counseling as well as Plaintiff's pain management. Significantly, Dr. Colen reported in June 2006 that Plaintiff's down mood was attributed to losing his job, filing bankruptcy, and losing his home. Situational depression is not disabling. See Dunahoo, 241 F.3d at 1039-40 (holding that depression was situational and not disabling because it was due to denial of food stamps and workers compensation). Indeed, Social Worker Oliver commented in January 2007 that Plaintiff benefitted from having someone to talk to regarding his health problems. Conditions which can be controlled by treatment are not disabling. See Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling);Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James, 870 F.2d at 450. Also, as discussed above, the ALJ considered that Plaintiff's GAF was assessed to be 62, which reflects only mild symptoms.

The ALJ considered that despite Plaintiff's having depression he was able to work on a part-time basis. "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Johnson v. Apfel, 240 F.3d 1145, 1148049 (8th Cir. 2001).

"Working generally demonstrates an ability to perform a substantial gainful activity." Goff, 421 F.3d at 792 (citing Nabor v. Shalala, 22 F.3d 186, 188-89 (8th Cir. 1994)).  20 C.F.R. § 404.1574(a) provides that if a claimant has worked, the Commissioner should take this into consideration when determining if the claimant is able to engage in substantial gainful activity.  Moreover, when a claimant has worked with an impairment, the impairment cannot be considered disabling without a showing that there has been a significant deterioration in that impairment during the relevant period. See Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990).

Only after considering Plaintiff's medical records, as well as his testimony, did the ALJ determine Plaintiff's RFC. To the extent that  it can be said that the ALJ's decision is deficient in regard to his addressing Plaintiff's depression, an "arguable deficiency in opinion-writing technique," however,  does not require a court to set aside an administrative finding when that deficiency had no bearing on the outcome. See  Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Carlson v. Chater, 74 F.3d 869, 871 (8th Cir. 1996); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). The court finds that the decision of the ALJ in regard to Plaintiff's depression is supported by substantial evidence and that it is consistent with the Regulations and case law.

**C.     Testimony of Plaintiff's Landlord and his Daughter:**

Plaintiff contends that the ALJ failed to consider the testimony of his daughter and of his landlord.  Indeed, Plaintiff's daughter, Lisa Hanuarer, and Plaintiff's landlord, Gloria Smashey, completed third party questionnaires.  Plaintiff's daughter stated, among other things, that Plaintiff is always sick; that he is in and out of the hospital all the time; that his back hurts; that she has seen him in severe pain; that in the prior ten years his health has "gone down hill"; that his condition "puts him into tears"; that Plaintiff can walk before having to sit down "maybe 5 minutes"; that he can stand before having to sit or lie down "approx 3 minutes"; that he can lift three pounds with one hand and

six pounds with two hands; and that if he is sick he "can't do anything." Tr. 260-62. Plaintiff's landlord stated, among other things, that Plaintiff cannot work due to numerous problems, including MRSA, neck pain, shortness of breath, shoulder pain, and back problems; that he cannot work due to depression, sleep disorder, stress, and because he is uncomfortable around people; that she can tell Plaintiff is in pain by the way he walks and holds his shoulders; that he does not walk as much as he use to; and that Plaintiff can lift five pounds with one hand and ten to twelve pounds with both hands. Tr. 265-67.

The Eighth Circuit has frequently criticized the failure of the ALJ to consider subjective testimony of a claimant's family and others. Robinson v. Sullivan, 956 F.2d 836, 842 (8th Cir. 1992) (holding that despite the Eighth Circuit's repeated directives that the Secretary specifically discuss each credibility determination made, the ALJ failed to state the reasons for discrediting the testimony of the claimant's wife). A failure to make credibility determinations concerning such evidence requires a reversal and remand. Smith v. Heckler, 735 F.2d 312, 317 (8th Cir. 1984). However, while such testimony must be considered, no case directs belief in such testimony as credible. Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988). If the ALJ is to reject such testimony, it must be specifically discussed and credibility determinations expressed. See Smith, 735 F.2d at 317. Where an ALJ does not specific reasons for discrediting witness testimony but it is nevertheless clear that the ALJ considered the witnesses testimony, such failure may be considered a deficiency in decision writing technique which does not require remand. See Robinson, 956 F.2d at 841. In the matter under consideration, the ALJ did not address third party testimony. However, the testimony of Plaintiff's daughter and landlord merely corroborated Plaintiff's testimony regarding his subjective allegations. See Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992) ("While it is preferable that the ALJ delineate the specific credibility determinations for each witness, an 'arguable deficiency in

opinion-writing technique' does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome."). As discussed above, the ALJ addressed Plaintiff's subjective complaints and discredited them based on the medical records and other factors as suggested by Polaski. The court has found that the ALJ's decision in regard to his consideration of the medical records is based on substantial evidence and that it is consistent with the Regulations and case law. Indeed, the same evidence which the ALJ used to discredit Plaintiff allegations is applicable to whether the assertions of Plaintiff's daughter and his landlord are credible. See id. Under such circumstances, it can be said that the failure of the ALJ to address this testimony is of no consequence. See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992) (holding that the failure to expressly discredit third party testimony has no bearing on an outcome where the witness testimony can be discredited by the same evidence that discredits the claimant's testimony). Moreover, to the extent that Plaintiff's daughter and his landlord commented on Plaintiff's ability to engage in work-related activities, they are not qualified to give an opinion in this regard. See Lorenzen, 71 F.3d at 318-19 (holding that a claimant's parents were not qualified to give an opinion regarding her capacity to work). As such, the court finds, although the ALJ failed to specifically address the third-party reports of Plaintiff's daughter and landlord, that the decision of the ALJ is supported by substantial evidence.

**D.      Vocational Expert Testimony:**

The ALJ discredited Plaintiff's claim of frequent vomiting and his claim that he is unable to bend, squat, or stoop. As such, the ALJ found that Plaintiff has the RFC to perform the full range of work at all exertional levels but with the non exertional limitation that he must avoid concentrated exposure to temperature extremes, humidity, wetness and pulmonary irritants. In particular, the ALJ found that, to the extent Plaintiff has nausea and vomiting, this is "a subjective complaint, and even

so, [it] is very infrequent." Tr. 13.  Further, the ALJ found that "no restrictions to limiting or

eliminating bending, squatting, and stooping have been imposed on Plaintiff by doctors." Tr. 13.  As

such, the ALJ imposed no restrictions in this regard. The ALJ reached his conclusion after

considering Plaintiff's medical records, as discussed above.  The court finds that the ALJ's RFC

finding is consistent with Dr. Colen's records as well as other medical evidence of record and that it

is supported by substantial evidence on the record.

Only after determining Plaintiff's RFC did the ALJ pose a hypothetical to a VE, Dr. Darryl

Taylor, which hypothetical included the limitations which the ALJ found credible.  The hypothetical

posed to the VE was that:

> The claimant is 53 years of age or approaching advanced age; and that he ...  has a
> limited education, an eleventh grade education; and that he has the work experience
> and no transferability of skills [of a truck driver and garbage hauler]; and that he has
> been diagnosed with and suffers from diabetes mellitus II, chronic obstructive
> pulmonary disease, hypocholesternia (phonetic), there's some indication of [ ] back
> pain, and [ ] major depression; that [ ] despite his chronic obstructive disease, he still
> smokes a half a pack of cigarettes a day. ... .
>
> ...
>
> ... [The] person at the State Agency says that there's no exertional limitations
> established, and that -- however, environmentally he should avoid concentrated to
> exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dust, gases,
> and poor ventilation.  And he [has] hepatitis C.

Tr.  63-64.

In regard to Plaintiff's part-time work as a cab driver, the VE testified that he did not believe

that this work was substantial gainful activity, but further testified that "vocationally" it offered skills

similar to that of a truck driver position and that it was semiskilled. Tr. 63.  The VE testified that

Plaintiff's past relevant work as a truck driver and as a trash hauler are medium semiskilled jobs.  The

VE testified that a person with the non exertional limitations as stated in the above quoted

hypothetical can perform Plaintiff's past relevant work. Tr. 65. The VE further testified that Plaintiff "would not be able to maintain competitive employment" if a hypothetical individual had vomiting to the extent as testified to by the Plaintiff at the hearing and if he were unable to bend, squat, or stoop as Plaintiff testified at the hearing. Tr. 65.

After considering the VE's testimony, the ALJ found that Plaintiff can perform his past relevant work as a truck driver and/or as a cabdriver on a full time basis. Tr. 14. Plaintiff contends that the ALJ improperly failed to consider the VE's testimony that there are no jobs which Plaintiff can perform based on his being unable to bend, squat, or stoop and based on Plaintiff's frequent vomiting.

An ALJ posing a hypothetical to a VE is not required to include all of a claimant's limitations, but only those which he finds credible. Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("In posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record."); Sobania v. Sec'y of Health Educ. & Human Servs., 879 F.2d 441, 445 (8th Cir. 1989); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988). A hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence); Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Sobania, 879 F.2d at 445; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Where a hypothetical question precisely sets forth all of the claimant's physical and mental impairments, a VE's testimony constitutes substantial evidence supporting the ALJ's decision. Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990). The hypothetical posed to the

VE by the ALJ in the matter under consideration included all of Plaintiff's limitations which the ALJ found credible. As such, the hypothetical was proper according to the Regulations and case law. See Grissom, 416 F.3d at 836; Gilbert, 175 F.3d at 604; Jones, 72 F.3d at 82; Sobania, 879 F.2d at 445; Rautio, 862 F.2d at 180.

To the extent that the VE testified that Plaintiff cannot work, it was in response to a hypothetical posed by Plaintiff's attorney which included limitations which the ALJ did not find credible. As such, the VE's response to the hypothetical posed by Plaintiff's attorney is not controlling. The ALJ was entitled to disregard the VE's testimony regarding the hypothetical person who had limitations based on Plaintiff's subjective complaints which the ALJ discredited, including vomiting and the inability to bend, squat, and stoop.

The Social Security regulations define "past relevant work" as "work experience [which] ... was done within the last fifteen years, lasted long enough for [the claimant] ... to learn to do it, and was *substantial gainful activity*." 20 C.F.R. § 404.1565(a). If the claimant is found to be able to perform the duties of his [or her] past relevant work, then he or she is considered not disabled and therefore ineligible for benefits. Bowen v. City of New York, 476 U.S. 467, 471 (1986); Martin v. Sullivan, 901 F.2d 650, 652 (8th Cir. 1990). The Eighth Circuit has commented that when determining whether a claimant can perform past relevant work, the following considerations are appropriate:

> The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issues as clearly and explicitly as circumstances permit.

> Sufficient documentation will be obtained to support the decision. Any case requiring consideration of PRW will contain *enough information on past work to permit a decision as to the individual's ability to return to such past work....*

Adequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations. Detailed information about strength, endurance, manipulative ability, mental demands and other job requirements must be obtained as appropriate. This information will be derived from a *detailed description of the work obtained from the claimant, employer, or other informed source….*

Groeper v. Sullivan, 932 F.2d 1234, 1238 (8th Cir. 1991) (citing  S.S.R. No. 82-62, Soc. Sec. Rep. 809, 811-12 (West 1983).

S.S. R. 82-62, requires that an ALJ has an obligation to "'fully investigate and make explicit findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant [him]self is capable of doing before he determines that [he] is able to perform [his] past relevant work.'" Id. at 1238 (quoting Nimick v. Secretary of Health and Human Servs., 887 F.2d 864, 866 (8th Cir.1989).  Moreover, where the record contains substantial evidence that claimant can perform past work, the ALJ's failure to develop past work record in full detail does not require remand. See Battles v. Sullivan, 902 F.2d 657, 659 (8th Cir.1990)

An *ALJ must make explicit findings regarding the actual physical and mental demands of a claimant's past work.* See Battles, 902 F.2d at 659. *"Then, the ALJ should compare the claimant's residual functional capacity with the actual demands of the past work to determine whether the claimant is capable of performing the relevant tasks."* Id.  (citing  Kirby v. Sullivan, 923 F.2d 1323 1326-27 (8th Cir. 1991)).

The ALJ in the matter under consideration held that Plaintiff can perform his past relevant work as a truck driver and/or cabdriver on a full time basis. Tr. 14.  Indeed, Plaintiff testified how he performed his job as a cab driver; that he worked, at a maximum, *ten hours a month*; that he earned about *$125 a month* as a cab driver; and that some weeks he did not work at all as a cab driver.  The

record, however, does not reflect how long Plaintiff worked as a cab driver.[4]   As stated above, to

be past relevant work, work must be substantial gainful activity. "20 C.F.R. § 404.1574(b)(2) creates

a presumption that an employee who earns more than $300.00 per month is engaged in substantial

gainful activity." Burkhalter v. Schweiker, 711 F.2d 841 (8th Cir. 1983). Work performed for a short

period of time is not considered substantial gainful activity. See id. (citing § 404.1574(a)(1)). The VE,

moreover, suggested that Plaintiff did not perform cab driver work at the substantial gainful activity

level and the ALJ did not disagree. Tr. 63.  Nonetheless, the ALJ considered Plaintiff's work as a cab

driver past relevant work and determined that Plaintiff can perform this work.  The court finds,

therefore, that substantial evidence on the record does not support the ALJ's statement that Plaintiff's

work as a cab driver is past relevant work and that the ALJ's decision in this regard is not consistent

with the Regulations. See 20 C.F.R. § 404.1565(a).  As such, the court finds that the ALJ's finding

that Plaintiff is not disabled because he can work as a cab driver is not supported by substantial

evidence.

　　　　Further, the record in the matter under consideration does not reflect the nature of Plaintiff's

past relevant work as a truck driver and/or a trash hauler and/or how he performed these jobs.  As

such, it cannot be said that the testimony of the VE that Plaintiff can perform this past relevant work

is supported by substantial evidence.  The court will, therefore, reverse and remand this matter in

order for the ALJ to obtain testimony regarding the nature of Plaintiff's past relevant work as a truck

driver and/or trash hauler.  Also, upon remand the ALJ should consider whether there is work, other

than Plaintiff's past relevant work, which he can perform.[5]  The court notes that it does not mean to

---

　　　　[4]　　　　The court notes that work may be substantial gainful activity even if it is performed
on a part-time basis. See 20 C.F.R. § 404.1572.

　　　　[5]　　　　The court does not mean to say that Plaintiff cannot work as a cab driver; rather,
the court finds only that substantial evidence on the record does not support the finding that

say that Plaintiff is disabled but rather is concerned only that the decisions as it now stands is not supported by substantial evidence. Upon remand, the ALJ should also ask the VE if there are jobs available in the local and national economy, other than Plaintiff's past relevant work, which a person with Plaintiff's RFC can perform.

## VI.
## CONCLUSION

The court finds that this matter should be reversed and remanded to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4. Upon remand, the ALJ is directed to fully develop the record in a manner consistent with this court's opinion. **The court stresses that upon reversing and remanding this matter it does not mean to imply that the Commission should return a finding of "disabled."** The court is merely concerned that the Commissioner's final determination, as it presently stands, is not supported by substantial evidence on the record as a whole.

**ACCORDINGLY,**

**IT IS HEREBY RECOMMENDED** that the relief which Plaintiff seeks in his Complaint and Brief in Support of Complaint should be **GRANTED** in part, and **DENIED**, in part. Doc. 1, Doc. 11

**IT IS FURTHER RECOMMENDED** that a Final Judgment of Reversal and Remand should issue remanding this case to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4.

---

Plaintiff's work as a cab driver is past relevant work for purposes of determining, at Step 4, that Plaintiff is not disabled. At Step 4 if there is no past relevant work which Plaintiff can perform, the ALJ must proceed to Step 5 to determine if there is work available in the national economy which Plaintiff can perform. It is possible that, if there is such work, that this work includes cab driver positions.

The parties are advised that they have fourteen (14) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

Dated this <u>7th</u> day of April, 2010.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE